**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PANAMA CITY DIVISION**

**SHIRLEY HARRIS,**

    **Plaintiff,**

vs.                                                                                   CASE NO. 5:10-cv-24/RS-EMT

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

    **Defendant.**
_____/

## ORDER

    Plaintiff, Shirley Harris, applied for disability benefits on April 17, 2006, alleging disability due to bilateral carpel tunnel syndrome, arthritis in the knees, shoulder injury, back pain, cervical spondylosis, and anxiety. Doc. 23, p.2; Tr. 46; Tr. 53. On November 28, 2008, after a hearing, an administrative law judge ("ALJ") issued a finding that Plaintiff was not disabled under the Social Security Act. Doc. 23, p.2; Tr. 21-28. On December 28, 2009, the Appeals Council of the Social Security Administration denied Plaintiff's request for review of the hearing decision, thereby rending the ALJ's decision final. Doc. 23, p. 3; Tr. 3-5.

    Plaintiff's last date of insured status for disability benefits was December 31, 2007. Tr. 23. Plaintiff was 52 years of age on December 31, 2007, is a high school graduate, and has a past relevant work as a bookkeeper and traffic clerk. Doc. 23, p.3; Tr. 26.

The Administrative Law Judge determined that Plaintiff was not disabled and had a residual functional capacity ("RFC") to perform low-end semi-skilled light work, with the exception that Plaintiff can only occasionally reach overhead.  Tr. 24.  The ALJ found that the Plaintiff "had the following severe impairments: obesity, degenerative disc disease of the lumbar spine, arthritis of the knees, shoulder pain and carpal tunnel syndrome," but concluded the impairments did not equal the listing of 20 CFR Part 404, Subpart P, Appendix 1, either alone or in combination.  Tr. 23-24.

The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however the [Plaintiff's] statements concerning intensity, persistence and limiting effects of these symptoms are not credible [to the extent they conflict with the residual functional capacity]."  Tr. 25.  The ALJ found that the residual functional capacity allowed the performance of Plaintiff's past relevant work as well as other work which exists in significant numbers in the national economy such as ticket seller, and parking lot attendant.  Tr. 26-27.

The ALJ also found that in reviewing the "objective medical evidence in the record," Plaintiff failed to establish a medical condition that "could reasonably be expected to produce incapacitating pain."  The ALJ noted that Plaintiff failed to attend physical therapy as recommended,[1] made inconsistent statements regarding her activities of daily living, and that no doctor had recommended surgery or had found that Plaintiff was completely unable to work.  Tr. 25-26.

---

[1] Failure to follow prescribed treatment, without good reason, could result in the finding of not disabled.  20 C.F.R § 404.1530.

**Standard of Review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  *Phillips v. Barnhart*, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision."  *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether

the conclusions reached are rational.'" *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Both the "impairment" and the "inability" must be expected to last not less than 12 months. *Barnhart v. Walton*, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 404.1520. A finding of disability or no disability at any step renders further evaluation necessary. The steps are:

1. Is the individual currently engaged in substantial gainful activity?
2. Does the individual have any severe impairments?
3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?
4. Does the individual have any impairments which prevent past relevant work?
5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy.  *Chester*, 792 F.2d at 131; *MacGregor v. Bowen*, 786 F.2d 1050,1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).

### Evidence from the Administrative Hearing

Plaintiff testified that her past work consisted of being a traffic clerk and a bookkeeper.  A traffic clerk position consists of scheduling television commercials for a local station and requires "sitting at a desk" and "working on the computer all day."  Tr. 334.  Plaintiff also testified that as recently as a few weeks before the hearing, she was employed twenty hours a week by her church as a bookkeeper, for an organization called Youth In Action, Inc.  Tr. 335; Tr. 104.  In 2000, Plaintiff told her physician Roger Gamad, MD, that she worked in a flower shop, although this past-work experience does not appear elsewhere in the record.  Tr. 297.

Plaintiff stated that she could not continue the type of work she had done in the past because "continuous sitting" makes her legs and hands go numb and results in severe low back pain.  Tr. 337-38.  Plaintiff testified that doctors had not recommended surgery

for her back, but that she took injections which had the side effects of dizziness and drowsiness. Tr. 338-339. Plaintiff rated the pain in her back as an eight on a scale of ten. Tr. 339.

Plaintiff also testified that arthritis in her knee inhibited her ability to walk and the pain rated as a nine on a scale of ten. Tr. 340-41. Plaintiff stated that she could stand for a period of up to fifteen minutes, although she would endure pain throughout. Tr. 348. Plaintiff testified that the knee and back pain caused the most restrictions on her ability to work. Tr. 347.

Plaintiff also stated that carpal tunnel syndrome made it difficult for her to write or type. Plaintiff claimed that she could perform these tasks for a time, up to fifteen minutes, before her hands went numb. However, she stated that surgery had not been recommended as treatment. Rather, the medication Celebrex had been prescribed and provided minimal relief. Tr. 341-42.

Plaintiff further testified that shoulder pain caused by tendonitis with a possible tear and spurs in the cervical spine were also medical problems. The shoulder pain rated a six on a scale of ten. Tr. 344; Tr. 347.

As a result of all of Plaintiff's medical issues, Plaintiff stated that she could lift up to 10 pounds, including the weight of a gallon of milk. Tr. 345.

## Medical Evidence[2]

As early as July 2000, Plaintiff reported bilateral wrist pain and numbness of the hands to her family physician Michael Rohan, MD. At this time Dr. Rohan noted that Plaintiff also had "mild limitation of the cervical spine," but that motor function in the upper extremities was intact. Dr. Rohan also noted that "films of the writs [were] taken" and there were "no significant abnormalities." Dr. Rohan diagnosed Plaintiff with carpel tunnel syndrome[3] and cervical spondylolysis.[4] Tr. 252.

In September 2000, Dr. Rohan reported that Plaintiff's EMG/NCV[5] studies were normal and reaffirmed his diagnosis of cervical spondylolysis. Plaintiff was sent to physical therapy and was given Celebrex.[6] In January 2001, Plaintiff reported to Dr. Rohan that she did not attend physical therapy because "they told her therapy was requested for her low back." Dr. Rohan found "that hard to believe." Again, Dr. Rohan recommended therapy and informed Plaintiff of the need to stretch. Dr. Rohan specifically stated that Plaintiff "may continue working." Tr. 256. Also in January 2001,

---

[2] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at < http://www.pdrhealth.com/drugs/drugs-index.aspx >. Information about medical terms and prescription drugs come from DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS, available at: http://www.mercksource.com (Medical Dictionary link) or MEDLINE PLUS, found at http://www.nlm.nih.gov/medlineplus/mplusdictionary.html. Social Security Rulings can be found at: http://www.ssa.gov/OP_Home/rulings/rulfind1.html. The pages at these websites are not attached to this Order as the information is relatively well-settled, the precise definitions are not at issue in this case, and the definitions are not likely to be in dispute.
[3] Carpel tunnel syndrome is a condition caused by compression of the median nerve in the carpal tunnel and characterized especially by weakness, pain, and disturbances of sensation in the hand and fingers.
[4] Cervical spondylolysis is disintegration or dissolution of a vertebra.
[5] An EMG is an electromyogram. Electromyography is an electrodiagnostic technique for recording the extracellular activity of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation. NCV is Nerve conduction velocity and tests the speed of electrical signals through a nerve.
[6] Celebrex is a nonsteroidal anti-inflammatory drug (NSAID) used to treat acute (sudden) pain, menstrual cramps, pain and inflammation due to osteoarthritis, rheumatoid arthritis, and rheumatoid arthritis of the spine (ankylosing spondylitis).

Plaintiff visited Dr. Gamad and complained of "severe pain" in the right elbow.  Dr. Gamad diagnosed this as bursitis.[7]  Tr. 294.

By February 2001, Plaintiff reported to Dr. Gamad that Celebrex had helped the pain in her right elbow, but that her right hip had been hurting.  Tr. 291.  In March 2001, Dr. Rohan noted that Plaintiff had "some swelling" in her wrists after she continue[ed] to report tingling in her hands.  Dr. Rohan suggested "light [work] duty" and a limited work day of six hours.  In May 2001, Dr. Rohan reaffirmed his diagnosis for carpel tunnel syndrome and suggested that Plaintiff may have had osteoarthritis at the base of her thumb.  Dr. Rohan noted that Plaintiff "may continue to work six hour work day" as this "seems to be helping."  Tr. 255

In October 2001, Dr. Rohan reported that an MRI revealed that Plaintiff had "mild" degenerative disc disease, "mild" tenderness in the carpal ligament of both wrists, and disc bulge and spondylolysis in her cervical spine.  Tr. 254.  Plaintiff complained of "tremendous amount of stress" at work, but Dr. Rohan still stated that she could perform "light work."  This work recommendation was affirmed by Mark M. Williams, MD, in a report for workers compensation in which he stated that Plaintiff was capable of performing receptionist-type duty for eight hours a day or data entry duty for six hours per day. Tr. 264.  Here, Dr. Williams suggested that a 15% permanent impairment due to carpel tunnel was adequate.  Tr. 264.  Also in October 2001, Dr. Gamad reported that Plaintiff complained of pain and swelling in her left knee and leg that "occurred after she was digging a hole."  Tr. 289.

---

[7] Bursitis is inflammation of the fluid-filled sac (bursa) that lies between a tendon and skin, or between a tendon and bone. The condition may be acute or chronic.

In January 2002, Plaintiff was diagnosed with degenerative lumbar disc disease with possible ruptured disc. Plaintiff was prescribed Darvocet[8] for pain and Zanaflex[9] as a muscle relaxer. At this time, Plaintiff's x-rays showed spurring in her lumbar. Tr. 253. In March 2002, Dr. Rohan suggested that Plaintiff attend massage therapy to reduce pain and noted spurring in the cervical spine. Tr. 252. In April 2002, Dr. Rohan noted that sensory and motor function was normal in Plaintiff's hands. In September 2002, Dr. Rohan noted that Plaintiff reported that Aleve was helping her pain, and Dr. Rohan suggested that she "continue symptomatic treatment" with Naprosyn.[10] Tr. 250.

In January 2003, Dr. Rohan again diagnosed carpel tunnel and "possible anterior inner osseous nerve syndrome." Dr. Rohan stated that Plaintiff was "capable of doing some sort of work." Tr. 249. Dr. Rohan suggested that Plaintiff may need "carpel tunnel release"[11] depending on the results of new NCV study.

In November 2003, Dr. Gamad reported that Plaintiff continued to complain of leg pain, but that Plaintiff denied "any tingling or numbness."

In August 2005, Plaintiff visited Dr. Gamad and was diagnosed with arthritis in both knees. Tr. 206. By December 7, 2005, following a fall, Plaintiff's right shoulder had full range of motion and Dr. Rohan suspected rotator cuff tendonitis and possible tear. Tr. 184; Tr. 248.

---

[8] Darvocet contains two medicines, acetaminophen and propoxyphene, and is used to relieve mild to moderate pain.
[9] Zanaflex is used to control muscle spasms that interfere with daily activities.
[10] Naprosyn is a nonsteroidal anti-inflammatory drug (NSAID) used to treat pain, swelling, and inflammation from medical conditions such as arthritis, tendonitis (inflammation of a tendon), gout (severe and painful inflammation of the joints), menstrual cramps, ankylosing spondylitis (arthritis of the spine), and bursitis (inflammation and pain around the joints).
[11] Carpel tunnel release is surgery used to treat carpel tunnel syndrome.

On January 23, 2006, Dr. Michael Rohan diagnosed shoulder tendonitis. There were no definite tears, and Plaintiff had a full range of motion. Dr. Rohan recommended physical therapy and gave Plaintiff Celebrex. Tr. 183; Tr. 247.

On July 7, 2006, Plaintiff visited Dr. Gamad, and complained of low-back pain. Plaintiff noted that the pain "does not radiate to the lower extremities." Tr. 246.

As part of the disability determination process, in July 2006, Ayman T. Aboulela, M.D., noted that "as far as work related activities, she can sit, stand and walk, however she cannot carry of lift heavy objects." Tr. 261. In the Range of Motion Report, Plaintiff had full range of motion in all areas except lumbar spine forward flexion (60 degrees, with normal range of 0-90 degrees), lateral flexion (15 degrees with normal range of 0-25 degrees) and extension (15 degrees with normal range of 0-25 degrees). Tr. 258.

On July 24, 2006, Plaintiff had x-rays taken of her lumbar and James Strohmenger. M.D., reported that there was "degenerative change," and that Plaintiff had "anterior spurring in the lower thoracic spine." Dr. Strohmenger also noted that the disc spaces were normal and that Plaintiff had sclerosis. Tr. 242.

On August 14, 2006, Plaintiff visited the Brain and Spine Center. Tr. 203-04. Tr. 236. A MRI of spine and lumbar was taken on August 16, 2006, and it revealed "moderately advanced bilateral facet arthropathy"[12] and "lumbar spine spondylosis."[13] Tr. 177; Tr. 187; Tr. 201; Tr. 237.

On August 31, 2006, the results of a nerve conduction study of Plaintiff's back at the Brain and Spine Center were "normal." The report stated that "there is no

---

[12] Arthropathy is a disease of the joint.
[13] Spindylosis is any of various degenerative diseases of the spine.

electrophysiologic evidence for lumbosacral radiculopathy."[14]  However, the report also stated that Plaintiff had "lower lumbar spondylosis" and "advanced facet arthropathy." Plaintiff was referred to HealthSouth for aquatic and massage therapy.  Tr. 189; Tr. 201; Tr. 239.

On October 2, 2006, the Brain and Spine Center record noted that Plaintiff prescription for Lyrica[15] had helped.  The Center's record also noted that Plaintiff had not attended "massage therapy" or "aquatic therapy" as recommended because she could not find a location that would take her insurance.  Tr. 199; Tr. 232.

November 9, 2006, a Physical Residual Functional Capacity Assessment was performed by Dr. Clarence Louis.  That assessment found that the severity of Plaintiff's symptoms and the alleged effect on function is "not entirely consistent with the total medical and nonmedical evidence."  Tr. 228.  In making this assessment, Dr. Louis relied upon medical notes from Plaintiff's treating physicians which contained the results from the MRI of the lumbar spine, the x-ray of the lumbar, the MRI of the right shoulder, and the NCV/EMG.  Tr. 224-225.  Dr. Louis reported that "some allegations and symptoms [are] disproportionate to the expected severity and duration that would be expected on basis of the [Plaintiff's] medically determinable impairments.  Tr. 228.

On December 26, 2006, Plaintiff reported to Dr. Gamad tenderness in her left elbow.  Dr. Gamad advised Plaintiff that he would send her to an orthopedic doctor.  She wanted to wait to be sent.  Tr. 204.

---

[14] Radiculopathy is any pathological condition of the nerve roots.
[15] Lyrica is a medicine used to treat seizures, pain from damaged nerves (neuropathic pain) that occur from diabetes and shingles (painful rash caused by chickenpox virus), and fibromyalgia (widespread muscle pain)

On February 19, 2007, x-rays were taken and it was noted that "radiographic appearance of the left elbow is normal." Tr. 186.

On March 6, 2007, Stephanie Breland, ARNP, noted that Plaintiff's x-rays of the left arm were "normal" and that Plaintiff nevertheless continued to have pain in her arms. Plaintiff was cautioned that some of the medications she was taking had possible sedative effects. Tr. 195. An MRI of left elbow was conducted on May 8, 2007, and Dr. Karin Maddox diagnosed "mild tendinitis." Tr. 162. On May 8, 2007, Bay Medical Center again diagnosed "mild tendinitis of left elbow."

**Legal Analysis**

Plaintiff argues that 1) the residual functional capacity finding conflicted with her relevant past work; 2) the ALJ failed to consider the severity of Plaintiff's carpel tunnel syndrome; and 3) the ALJ committed reversible error in not posing a complete hypothetical question to the vocational expert. The Commissioner argues that the ALJ's findings were supported by substantial evidence and must, therefore, be sustained. The issue presented is whether the ALJ's decision that the Plaintiff was not disabled, in light of her physical and mental condition, age, education, work experience, and residual functional capacity, is supported by substantial evidence in the record.

   **1. ALJ's Consideration of Plaintiff's Carpal Tunnel Syndrome**

Plaintiff contends that that ALJ failed to consider the severity of her carpal tunnel syndrome when formulating the residual functional capacity. Doc. 23, p.10. This assertion is not supported by the record.

The record confirms that the ALJ specifically found that Plaintiff's "severe impairments" included carpel tunnel syndrome. Tr. 23. In making the RFC determination, the ALJ "considered all symptoms" and evaluated the "intensity, persistence, and limiting effects" of those symptoms. Tr. 24-25. The ALJ noted Plaintiff's testimony about the numbness in her hands and made specific mention of her carpel tunnel syndrome for which no surgery had been recommended. Tr. 25. The ALJ found that although Plaintiff had "some degree of pain, the objective and other evidence simply does not establish that the pain is as disabling as the [Plaintiff] alleges." Tr. 26.

The evidence the ALJ considered in making this assessment, as it pertains to the carpal tunnel syndrome, included among other things the following: that Plaintiff had recently worked at her church and stopped work for reasons other than disability; that Plaintiff could lift weight equal to a gallon of milk; that Plaintiff made inconsistent statements regarding her daily living; that no treating or examining physician had stated that Plaintiff was unable to work; that the state agency medical consultant concluded that Plaintiff had the residual functional capacity to work; and that no surgery had been recommended. Tr. 25-26.

It is also important to note that Plaintiff testified, and the ALJ noted, that the knee and back pain, <u>not</u> the carpal tunnel, caused most restrictions on her ability to work. Tr. 25; Tr. 347.

These facts provide substantial evidence that the ALJ did not fail to consider the severity of Plaintiff's carpal tunnel syndrome. Rather, the facts show that the ALJ considered the severity and formulated an appropriate residual functional capacity to take

it into account. Tr. 26. That is, the ALJ found that Plaintiff had the residual functional capacity to perform "light work as defined in 20 CFR 404.1567(b) except that [she] can only occasionally reach overhead. She requires a sit/stand option. In addition the [Plaintiff] is limited to unskilled or low-end semi skilled work." Tr. 24.

This residual functional capacity recognizes that "unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. They require use of arms and hands to grasp and to hold and turn objects, and they generally *do not require use of the fingers for fine activities* to the extent required in much sedentary work." SSR 83-10, 1983 SSR LEXIS 30 at *14, 1983 WL 31251, at *6-6 (S.S.A.) (emphasis added). This Social Security Ruling supports the Defendant's position that the RFC took into account limitations caused by Plaintiff's carpal tunnel syndrome.

## 2. RFC and Work Ability

The fourth step of the evaluation process determines whether the individual has any impairments which prevent past relevant work. If the individual is not able to perform past relevant work, the Commissioner may nevertheless meet the burden to establish that the individual's impairments do not prevent other work. 20 C.F.R. § 404.1520 (a)(4)(iv-v). A finding that Plaintiff can either perform past work or can "make an adjustment to other work," results in a not-disabled determination. *Id*.

To help determine Plaintiff's work ability, the ALJ posed a hypothetical question to the vocational expert to "name some examples of [the] type of work" that would be "limited to a range of light work, which would need to accommodate a sit/stand option

and occasional overhead reaching." In addition, the ALJ required the vocational expert to "keep [the answer] to the unskilled or semi-skilled range of [specific vocational preparation]." Tr. 354. This description of work mirrors what the ALJ found to be Plaintiff's residual functional capacity.[16] The vocational expert responded that he could name "various different job titles" that met the ALJ's request including "ticket seller" and "parking lot attendant" which had significant employment in the local and national economy. Tr. 354-55.

Plaintiff is correct that "in order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Wilson*, 284 F.3d at 1227. Plaintiff contends that the ALJ erred by failing to pose a hypothetical question to the vocational expert that included any limitations imposed by the Plaintiff's carpel tunnel syndrome. Doc. 23, p. 12. The hypothetical question was proper because it contained the limitations of the residual functional capacity verbatim, and the residual functional capacity took into account the limitations of Plaintiff's carpal tunnel syndrome. *See supra* Section 1.

The Commissioner's finding that Plaintiff could perform other work based upon the vocation expert's testimony, therefore, is supported by substantial evidence. As such, the burden shifts back to the Plaintiff to prove that she is unable to perform the jobs suggested. *Hale*, 831 F.2d at 1011 (11th Cir. 1987). Plaintiff has not refuted the finding.

---

[16] In this case, the ALJ found that Plaintiff had the residual functional capacity to perform "light work as defined in 20 CFR 404.1567(b) except that [she] can only occasionally reach overhead. She requires a sit/stand option. In addition the [Plaintiff] is limited to unskilled or low-end semi skilled work." Tr. 24. Plaintiff contends that the ALJ failed to ask the vocational expert whether Plaintiff could "perform her past relevant work; [rather] he simply asked whether her past relevant work would allow for a sit stand option." Doc. 23, p.10.

Plaintiff's final argument that the ALJ erred in determining that Plaintiff could return to her past relevant work is made moot by the proper finding that Plaintiff could perform other work because each of the five steps serve as an independent basis for disability determinations.  *See* 20 C.F.R. § 416.920.

In sum, the Commissioner's decision is supported by substantial evidence that the residual functional capacity took into account the severity of Plaintiff's carpal tunnel syndrome, and that the questions posed to the vocational expert were proper and resulted in a correct finding that Plaintiff could perform other work.

**IT IS ORDERED**:

1. The Commissioner's Decision to deny Plaintiff's application for Social Security Benefits is **AFFIRMED**.
2. The case is dismissed.
3. The Clerk is directed to close the file.

**ORDERED** on May 3, 2011.

/S/ Richard Smoak
**RICHARD SMOAK**
**UNITED STATES DISTRICT JUDGE**